[No. A014978. First Dist., Div. Two. Nov. 19, 1984.]

ALLEN MERLE NELSON, Plaintiff and Appellant, v.
DEPARTMENT OF REAL ESTATE, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of issues II and III.

COUNSEL

John J. Hartford for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Richard F. Finn, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**ROUSE, J.**—Plaintiff Allen Merle Nelson appeals from a judgment denying his petition for a writ of mandate in which he sought to reverse a temporary

suspension of his real estate license which was imposed by the Department of Real Estate (DRE) for violation of sections of the Business and Professions Code.

On August 21, 1979, the DRE filed an accusation against California Consolidated Financial Services, Inc. (CCFS) and plaintiff.

CCFS was licensed as a real estate broker through plaintiff, its president. It also employed Carl Willis, who was an officer, and George M. George; however, neither Willis nor George were licensed brokers. Among other things, CCFS was in the business of soliciting borrowers and helping them to obtain loans.

The accusation filed by the DRE alleged (1) that George and Willis solicited agreements with Paul Spencer and Thomas Calvo, pursuant to which CCFS agreed to assist them in obtaining loans which were to be secured by real estate; (2) that Spencer and Calvo in turn agreed to and immediately paid to CCFS certain money "as a fee" to obtain loans; (3) that these fees were "advance fees" within the meaning of section 10026 of the Business and Professions Code[1]; (4) that these fees were not placed in trust accounts as required by section 10146[2]; (5) that plaintiff, "as designated officer and broker of record for CCFS," failed to supervise George and Willis properly in that he should have known that the "advance fees" were improperly handled; (6) that George and Willis were acting as licensees without being licensed themselves; and (7) that the violation of section 10146 and plaintiff's acts and omissions in supervising George and Willis constituted grounds for disciplinary action under section 10177, subdivisions (d) and (g).[3]

---

[1]Section 10026 provides: "The term 'advance fee' as used in this part is a fee claimed, demanded, charged, received, collected or contracted for a listing, advertisement or offer to sell or lease property, other than in a newspaper of general circulation, issued primarily for the purpose of promoting the sale or lease of business opportunities or real estate or for referral to real estate brokers or salesmen, or soliciting borrowers or lenders for, or to negotiate loans on, business opportunities or real estate."

Unless otherwise specified, all statutory references are to the Business and Professions Code.

[2]Section 10146 provides, in relevant part: "Any real estate broker who contracts for or collects an advance fee from any other person, hereinafter referred to as the 'principal,' shall deposit any such amount or amounts, when collected in a trust account with a bank or other recognized depository."

[3]Section 10177 provides, in pertinent part, as follows: "The commissioner may suspend or revoke the license of any real estate licensee, or may deny the issuance of a license to an applicant, who has done any of the following: . . . [¶] (d) Willfully disregarded or violated any of the provisions of the Real Estate Law (commencing with Section 10000 of this code) or of Chapter 1 (commencing with Section 11000) of Part 2 of this division or of the rules and regulations of the commissioner for the administration and enforcement of the Real Estate Law and Chapter 1 of Part 2 of this division. . . . [¶] (g) Demonstrated negligence or incompetence in performing any act for which he is required to hold a license."

At a hearing on the accusation before an administrative law judge, Mr. Spencer testified that he had never met plaintiff. He said that in 1977 he sought a $10,000 loan on his house to buy a company and so he responded to a CCFS advertisement. He talked to George about a loan, and George referred him to Willis. He explained his need to Willis and Willis said "fine," but that he required a "retainer fee" of $200. Spencer testified that he thought that this fee was part of the overall finder's fee which was to be 5 percent of the loan proceeds if the loan was obtained. Spencer said, however, that he read and signed an agreement and gave Willis a check for $200. (See Appendix A.)

Under the agreement CCFS agreed to assist Spencer in obtaining a loan for a fee. The agreement, however, required the immediate payment of a fee for "the preparation of our standard loan package, for the time involved to appraise the feasibility of the loan requested and for the time involved in reviewing the details of this loan with any potential lender or lenders."

Mr. Thomas Calvo testified that he too responded to a CCFS advertisement because he wanted a $60,000 loan in order to buy a business. He said that he went to the CCFS office, talked with someone about his loan, was given some forms to fill out, and made a return appointment. At his next appointment, he spoke with Mr. Willis, who told him that he had people willing to lend him the money and that there would be no trouble getting the financing. At that time, Calvo thought CCFS was going to be the lender. Calvo testified that after talking about the percentage finder's fee, Willis asked him for a check for $1,000 "to process the paper work." Calvo paid the $1,000.

Mr. Calvo was shown a copy of the Spencer agreement and asked if he had read and signed a similar agreement. He admitted that he had. He also admitted that Mr. Willis had told him that his $1,000 check was for the preparation of his loan package.

Mr. John Yulep, a field auditor for the DRE, testified that he was assigned to audit and review the activities of CCFS. He said that he traced Mr. Calvo's $1,000 check into a CCFS bank account. He said that CCFS had two accounts and that the signature cards for each did not indicate that either was a trust account and, therefore, he had assumed that these were not trust accounts. He testified that he interviewed plaintiff in order to obtain CCFS's bank records concerning the Calvo check. He said that plaintiff told him that he no longer worked for CCFS and that he knew nothing about the Calvo transaction.

Mr. Yulep testified that after his investigation he concluded that CCFS failed to deposit Mr. Calvo's advance fee into a trust account. He said that

he considered Mr. Calvo's payment to have been an advance fee because Calvo's loan was secured by real estate, the money was paid prior to Calvo's obtaining the loan, and the $1,000 check had "advance on fee" written on it. He testified, however, that he never saw the agreement signed by Mr. Calvo and that had he known that the $1,000 was for the preparation of a loan package, he would not have concluded that the money was an advance fee. He stated further that in his opinion the preparation fee provided for in the CCFS agreement was not an advance fee. He admitted, however, that this was his first advance fee investigation.

Plaintiff testified that preparation fees were not placed in trust accounts but rather in "a kind of depository" account and transferred to a general business account when the preparation was complete and it was felt that the customer would honor his check. He said that the funds were not spent until earned. He said that the fee was determined according to an estimate of how much work had to be done to prepare the loan packages and that time was charged at from $40-$50 per hour.

Plaintiff testified that the agreement used in the Spencer transaction was similar to but not the standard preparation fee agreement used by CCFS, and that he had not recommended using the form. He said that he was not personally involved in either the Spencer or Calvo transaction and he denied ever charging an advance fee.

Plaintiff further testified that as part of its business, CCFS would find sources of loans and then advertise to find customers for such loans. He testified that he performed this type of work but that George and Willis did not.

After the hearing, the administrative law judge issued a proposed decision in which he found that the violations occurred and that they were grounds for disciplinary action against plaintiff. On July 28, 1980, the California Real Estate Commission adopted this proposed decision.

On October 31, 1980, plaintiff filed a petition in the Santa Clara County Superior Court for a writ of mandate, pursuant to section 1094.5 of the Code of Civil Procedure. An alternative writ was issued, and on March 11, 1981, the court held a hearing on the merits of plaintiff's petition. After an independent review of the evidence, the court filed a memorandum of decision denying the petition. Plaintiff filed a request for findings, and on May 22, 1981, the court filed findings of fact and conclusions of law and entered judgment against plaintiff. Plaintiff filed objections to the court's findings and also objected to the fact that the court allegedly signed its findings

without considering his objections to them. On July 16, 1981, plaintiff filed a notice of appeal from the court's judgment.

## I.

■ Plaintiff contends that the fees which CCFS collected from Spencer and Calvo were not "advance fees" within the meaning of sections 10146 and 10026. He argues that because the CCFS agreement expressly separated the preparation fee from the percentage finder's fee, the preparation fee cannot be an advance fee.

The definition of "advance fee" includes any fee "claimed, demanded, charged, received, collected or contracted for" as consideration for "soliciting borrowers or lenders for, or to negotiate loans on, business opportunities or real estate." (§ 10026; see 1 Miller & Starr, Real Estate Law (1975 ed.) § 6:15, pp. 208-209.) (See fn. 1, *ante.*)

In this case, both Spencer and Calvo sought loans to buy businesses and responded to a CCFS advertisement which offered help in acquiring them. Spencer entered into a written agreement, prepared by CCFS, called "Agreement for Financial Services." (See Appendix A.) The agreement stated that Spencer was engaging CCFS to "assist in acquiring" his loan and that for a fee CCFS would "represent [Spencer], on a best efforts basis in acquiring this loan . . . ." According to the agreement, CCFS had the exclusive right for 30 days "to make a loan arrangement with a suitable lender." CCFS was entitled to a "finder's fee of 5%" which was payable only if Spencer accepted a loan. However, once Spencer accepted a loan, CCFS "ha[d] no further responsibility as agent for [Spencer] or any lender," and the percentage fee could be deducted from the loan proceeds. Spencer also agreed to pay a $1,000 fee "in advance" that was separate from and in addition to the percentage fee. This other fee was for the "preparation of [a] standard loan package, for the time involved to appraise the feasibility of the loan requested and for the time involved in reviewing the details of this loan with any potential lender or lenders." The agreement stated that Spencer paid $200 of this fee on August 25, 1977, and that the balance was due "on funding."

Calvo testified that he signed a similar, if not identical, agreement. However, he paid the entire $1,000 preparation fee in advance.

Clearly, Spencer and Calvo did not hire CCFS simply to have their loan packages assembled. Rather, they engaged CCFS to obtain loans. They were induced to pay advance preparation fees because CCFS promised to act as their exclusive agent in securing the loans. Indeed, the CCFS agree-

ment makes payment of the preparation fee a prerequisite to the rendition of any services. As such, we conclude that the initial preparation fees, although nonrefundable in whole or in part, were advance fees. They were "claimed, demanded, charged, received, collected [and] contracted for" by CCFS as part of its consideration for "soliciting . . . lenders for, or to negotiate loans on, business opportunities or real estate." (§ 10026.)

Although the agreement breaks CCFS's fee down into components, i.e., a percentage finder's fee and a loan package preparation fee, these components nevertheless comprise a single overall fee which Spencer and Calvo agreed to pay for the sole purpose of soliciting lenders, making loan arrangements, and obtaining their loans. ■ " 'Mere words and ingenuity of contractual expression, whatever their effect between the parties, cannot by description make permissible a course of conduct forbidden by law.' [Citation.] The question of the violation of a statute is not always determined with reference to the private rights of the parties to a transaction, and the result will not turn on the skill with which the parties have manipulated their transaction but on the significance of their acts in the terms of the provisions of the statute itself and of the public policy declared thereby. [Citation.]" (*Porter* v. *Fiske* (1946) 74 Cal.App.2d 332, 336 [171 P.2d 971].)

■ Plaintiff relies upon *Burch* v. *Argus Properties, Inc.* (1979) 92 Cal.App.3d 128 [154 Cal.Rptr. 485], for the proposition that nonrefundable fees for services to be rendered, such as CCFS's advance preparation fee, are not advance fees within the meaning of sections 10026 and 10146. However, plaintiff's reliance is misplaced.

In *Burch*, the court was not concerned with what sort of fees constitute advance fees. Rather, the issue was whether a broker who failed to render an accounting of trust account funds was guilty of violating section 10146 even if he had not actually diverted or misappropriated any of the funds. The court held that he was. (*Burch* v. *Argus Properties, Inc., supra,* 92 Cal.App.3d 128, 130.) Moreover, the court reaffirmed the importance of the accounting required by section 10146. It rejected defendant's argument that the plaintiff's attorney's fee award improperly included fees incurred by the plaintiff in unsuccessfully seeking to recover a nonrefundable broker's fee, stating, "Burch would have known the $5,000 advanced for costs was not to be returned and would not have needed to litigate this issue if [defendant] had provided him with the quarterly accounting required under section 10146." (*Id.,* at p. 132.)

In this case we do not deny CCFS's right to be paid for services that it renders in preparing loan packages regardless of whether it is ever able to

secure a loan for a client. However, in our view, the preparation fee clause fosters the harm that sections 10146 and 10026 seek to combat.

These sections and the Administrative Code regulations adopted by the Real Estate Commissioner (Commissioner) to govern the collection and treatment of advance fees were designed to protect potential borrowers like Spencer and Calvo from promoter fraud.[4]

Some promoters promise to help borrowers obtain loans secured by their real estate. For this service, they charge a percentage finder's fee which they claim is due only if the loan is obtained. However, these promoters demand a deposit or retainer in advance which they say is deductible from the ultimate percentage fee when the loan is obtained. The promoters use this advance fee to cover the "costs" they incur in trying to obtain the loan. The promoters then make only token efforts to find willing lenders. Often the loans are never obtained. Nevertheless, the promoters keep the entire deposit to cover their sometimes inflated "costs."

In order to prevent such hidden costs and token efforts, sections 10026 and 10146 require that advance fees be kept in formal trust accounts. A promoter is entitled to make withdrawals to cover "costs," but only when funds are actually expended for the principal's benefit. If a promoter fails to handle advance fees according to section 10146, it is presumed that he has embezzled the funds. (*Burch* v. *Argus Properties, Inc.,* *supra,* 92 Cal.App.3d 128, 131; Pen. Code, § 506, 506a.) Moreover, a principal is entitled to seek treble damages and attorney's fees in any action to recover allegedly misappropriated funds. (See *Burch, supra.*)

All materials used to obtain advance fee agreements must be submitted to the Commissioner for approval and may not be approved, if, inter alia, they tend to mislead, fail to set forth when the fee becomes payable, fail to set forth a definite date of full performance of the services contracted for, or circumvent the law or rules governing advance fees. (10 Cal. Admin. Code, §§ 2970, 2971.)[5]

The accounting that is required under section 10146 must include, inter alia, the nature of the services rendered or to be rendered (10 Cal. Admin. Code, § 2972, subd. (c)); the amounts, dates, and purposes of disbursements, together with the names of the payees (10 Cal. Admin. Code,

---

[4]For an express statement of the legislative purpose behind sections 10026 and 10146, see *Statutes 1959,* chapter 2117, section 14, pages 4942-4943.

[5]Unless otherwise specified, all references to the California Administrative Code are to the sections as they read at the time CCFS collected the fees in this case.

§ 2972, subd. (g)); and "[i]n the case of such services pertaining to loans on real property or business opportunities, a verified list of the firms and/or individuals to whom information relating to the principal's loan requirements have been referred and the dates of such referrals." (10 Cal. Admin. Code, § 2972, subd. (i).)

In addition, one who collects advance fees must send a statement to the Commissioner at least once a year which includes information concerning the total amount of advance fees collected and the "actual amount . . . allocated from each individual fee to overhead costs and to profit." (10 Cal. Admin. Code, § 2974, subd. (f).)[6]

In our view, these statutes and rules provide pervasive regulation of retainers, deposits, and nonstandard fees that a broker demands in advance to defray the variable expenses and costs that must be incurred in providing loan solicitation services. Clearly, the accounting that is required under section 10146 contemplates the inclusion and explanation of loan package preparation and distribution costs. In this case, the preparation fee clause permits CCFS to demand and collect a substantial fee in advance. However, the clause conceals the actual cost of preparing a loan package and the efforts expended in securing a client's loan. The record before us reveals the mischievious nature of this clause.

Plaintiff testified that the CCFS preparation fee was determined in light of an individual's particular loan requirements. Thus a consultation might take from two to five hours; preparation of the loan package might average ten hours; and CCFS' hourly rates might range from $40 to $50. In light of plaintiff's explanation of the preparation fee, it is reasonable to assume that Spencer's loan package would cost less than Calvo's. Spencer sought a simple $10,000 loan using only his house as security, whereas Calvo sought a $60,000 loan using not only his house as security but also property of the business that he hoped to buy with the loan. However, Spencer and Calvo were both charged the same $1,000 preparation fee, although Spencer only had to pay $200 of his $1,000 fee in advance with the balance due "on funding." Spencer's particular arrangement suggests that the balance would not be due unless there was loan funding. It further suggests that the $1,000 fee bore no direct relationship to the real cost of preparing his loan package. The record does not indicate that CCFS ever sought to collect this balance, if the loan package was actually prepared. And if the loan package was not prepared, the evidence fails to indicate whether CCFS rendered $200 worth of service. Finally, it is significant that plaintiff himself disclaimed the use of the CCFS agreement on the whole and did not recommend its use. We

---

[6]This rule was repealed in 1983.

can easily understand why. The description of loan package preparation services is general and vague. The method of calculating a particular client's fee is ambiguous, and what services are actually rendered is unclear.

Compliance with section 10146 would have eliminated all of these deficiencies. Both Spencer and Calvo would have known (1) what actually went into their loan packages; (2) what CCFS charges as its hourly rate for loan package preparation; (3) how many hours were actually spent in preparing the packages, "appraising the feasibility" of their loan requests, and "reviewing the details" with potential lenders; and (4) to whom these packages were sent. (See § 10146; Cal. Admin. Code, §§ 2970-2974.) Moreover, compliance with these requirements would still have permitted CCFS to charge and be paid for its services.

■ In light of our discussion, therefore, we concur with the trial court's finding that CCFS collected advance fees and failed to comply with the provisions of section 10146.

II.*

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Kline, P. J., and Smith, J., concurred.

---

*See footnote, *ante,* page 939.

APPENDIX A

# CALIFORNIA CONSOLIDATED
# FINANCIAL SERVICES, INC.

OFFICE OF ADMIN. HEARINGS COMPL. EXHIBIT... RESP AGENCY FILE NO. DATE

**AGREEMENT FOR FINANCIAL SERVICE**

THIS AGREEMENT, entered into this _1st 2nd_ day of _AUG_, 19_77_, by and between _PAUL N SPENCER_, hereafter referred to as APPLICANT and CALIFORNIA CONSOLIDATED FINANCIAL SERVICES, INC., hereafter referred to as BROKER

WHEREAS, Applicant wishes to arrange financing in the amount of _10 to 20K_,

and wishes to engage the services of Broker to assist in acquiring such loans.

WHEREAS, Broker wishes to represent Applicant, on a best efforts basis in acquiring this loan for a fee as hereinafter set forth.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1. Applicant agrees that Broker shall be granted exclusive right for a period of _30_ days to make a loan arrangement with a suitable lender.

2. Applicant agrees that upon receipt of the first loan with any lender that Broker shall be entitled to a finder's fee of _5%_ which is payable within 5 days from the time the loan is granted.

3. It is mutually agreed that Applicant may accept or decline any loan arrangement offered by any lender and that the Broker fee (Item 2) is earned and payable only upon acceptance by Applicant.

4. It is mutually agreed that after any loan arrangement is made, acceptable to Applicant, with any lender, Broker has no further responsibility as agent for Applicant or any lender.

5. It is mutually agreed that a copy of this agreement may be furnished to the lender which shall be the lender's authority to make such deduction from loan proceeds (Item 2) to compensate for his agreed finder's fee.

   _$200   AUG 25, 1977   nm ov c moving_

6. It is further understood that a fee of $ _1000⁰⁰_ is to be paid in advance expressly for the preparation of our standard loan package, for the time involved to appraise the feasability of the loan requested and for the time involved in reviewing the details of this loan with any potential lender or lenders. This fee is separate from the fee outlined in Item 2.

BROKER: _____

APPLICANT _Paul N Spencer_

CCFS-1